IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COPY

| | |
|---|---|
| USA | CRIMINAL ACTION 06-13T |
| VS. | MAY 30, 2006 |
| ROBERT TAYLOR | PROVIDENCE, RI |

HEARD BEFORE THE HONORABLE ERNEST C. TORRES

CHIEF DISTRICT JUDGE

(ROBERT TAYLOR TESTIMONY)

APPEARANCES:

FOR THE GOVERNMENT: LEE H. VILKER, ESQ.
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT: KEVIN FITZGERALD, ESQ.
Federal Defender's Office
10 Weybosset St.
Providence, RI 02903

Court Reporter: Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI 02903

Proceeding reported and produced by computer-aided stenography

# I N D E X


| WITNESS | PAGE |
|---|---|
| ROBERT TAYLOR | |
| Direct Examination by Mr. Fitzgerald: | 1 |
| Cross-Examination by Mr. Fitzgerald: | 15 |
| DEFENDANT'S EXHIBITS | |
| I - | 5 |

**ROBERT TAYLOR**, first having been duly sworn, testified as follows:

THE CLERK: State and spell your name for the record.

THE WITNESS: Robert Taylor, T-A-Y-L-O-R.

**DIRECT EXAMINATION BY MR. FITZGERALD**

Q. Good afternoon, Mr. Taylor.
A. Good afternoon.
Q. On March 18th, 2005, where were you working?
A. I was working for Taylor and Sons Moving Company.
Q. Who owns that moving company?
A. My grandfather.
Q. And how long have you worked for your grandfather?
A. About three, three years or a little bit more.
Q. On March 18th, 2005, were you working?
A. Yes, I was.
Q. Do you remember what day of the week that was?
A. Basically, it was a Friday. I had to load up a person in Boston and come back to Providence and then we drove the truck out to New York. So it was an all-day move, and I had to drive the truck to New York.
Q. So you went to work on Friday morning to Boston?
A. Yes.
Q. And then drove that person to where?
A. New York.

Q. What time did you finish up with the job in New York?

A. Probably like around let's say give or take ten, get back here maybe two and a half hours, get back here. So I got back here like around three o'clock in the morning.

Q. That's what time you remember getting back is three o'clock in the morning?

A. Yes.

Q. When you say you came back, where did you come back to?

A. 60 Fairfield, which my girlfriend, Diana Bonet, lived.

Q. So you went to your girlfriend's apartment?

A. Yes.

Q. Now, does Diana have a car?

A. Yes, she does.

Q. I'm sorry. Did she have a car on that day?

A. Yes.

Q. What kind of car was that?

A. It was a black Ford Expedition, 2001.

Q. I'm going to show you what's been marked as Defendant's I for identification. Can you see that on your screen?

A. Yes, I do.

Q. Is that the truck?
A. Yes, it is.
Q. That's Diana's truck?
A. Yes, it is.
Q. Did you use that truck?
A. Prior to that day or --
Q. Yes. Prior to that day.
A. No, I didn't.
Q. Who normally used that truck?
A. Sometimes myself or sometimes she does. Or if her brother doesn't steal it, then he does.
Q. But who normally used that truck?
A. Diana and myself sometimes.
MR. FITZGERALD: Move to have this, I'm sorry, Defendant's I in full.
MR. VILKER: No objection.
THE COURT: Exhibit I may be admitted as a full exhibit.
(Defendant's Exhibit I marked full.)
MR. FITZGERALD: If we could publish it to the jury, please.
Q. Now, on March 18th, did you have that truck with you?
A. No, I did not.
Q. Who had that truck on March 18th?

A. Diana.
Q. When you got home -- I'm sorry. When you got back to 60 Fairfield at three in the morning, was the truck there at the apartment?
A. No, it wasn't.
Q. Was Diana there at the apartment?
A. No, she wasn't.
Q. Do you know where Diana was?
A. I assume that she was at work. Sometime when she gets out of work, her and her friends, they go out to eat or I don't know what they do. I mean, they're dancers so I don't know what they do after work.
Q. Okay. But she wasn't home?
A. No, she wasn't.
Q. Did you see her before you went to sleep that morning?
A. Did I see her before I went to sleep?
Q. At three o'clock in the morning you got home --
A. No, I didn't see her. No, I did not.
Q. When did you see her next?
A. That night, I believe she came home. She woke me up that morning, and told me that she had to get her son. Then I fell back to sleep. Then she woke me up right around the afternoon time, and we were supposed to go get insurance on another vehicle, because she was

going to trade that vehicle in.
Q. Okay. Do you remember what time that was?
A. I know it was around the afternoon time. I can't recall what time actually. I was still half asleep.
Q. And after she woke you up, what did you do next?
A. We fought a little bit, because I told her I was tired, I just came home from doing a moving job. And to stop the argument, I told her, I said, "Well, let's just go," to end the argument. I get into the vehicle, try to start the vehicle up, the vehicle dies out. I try to start the vehicle up again, and the light, the gas light comes on. The next thing you know, I start arguing with her about not putting no gas in the vehicle. Being that that's her neighborhood and I really don't live around there, I told her to go find someone that she knows around there to get a gas can.
Q. Did she leave to go get a gas can?
A. Yes, she did.
Q. When she went to go get a gas can, where were you?
A. I was sitting in the driver's seat smoking a cigarette.
Q. I'm going to show you what's been marked as Government's 4.
MR. FITZGERALD: Publish that to the jury as well, please.

Q. Do you recognize that area?
A. Yes, I do.
Q. Where is that?
A. That's the back parking lot of 60 Fairfield.
Q. And if you could, on your screen there, could you touch or lightly tap where the Expedition was?
A. (Indicating.) Right there where I believe it's the gold Intrepid is.
Q. The front part?
A. Yes.
Q. That's where the Expedition was parked?
A. Yes.
Q. That's where you tried to put the key in and it didn't run?
A. Yes.
Q. Now, when you're sitting in the Expedition with the cigarette, what happened next?
A. I started to play the music. Next thing you know, the officer, I believe his name is Zincone, opens up the car door, tells me to put the cigarette out and begins to search me. So by that time, I had actually looked in his face because by that time I'm agitated and I said to him, "You guys just searched me last week." And I thought it was kind of like him harassing me at that time.

Q. Let me ask you this. You said you recognized the officer?
A. Yes, I do.
Q. What do you recognize him from?
A. Prior to that week, I was parked in this section right there where that van is. It was probably like around six o'clock. Diana and myself were parked there. She lives right around the corner from there. Her window is directly in front of the parking lot. She went in to go grab her bag so she can be dropped off at work. I sit there, the same thing I'm doing, playing music, the officer comes up, opens the car door, tells me to step out.
Q. Do you remember who that officer was?
A. Yes.
Q. Who was that?
A. Zincone and Officer O'Brien.
Q. So you saw Officer O'Brien as well that prior time?
A. Yes.
Q. And to the best of your recollection, how long ago was that -- I'm sorry. When was that?
A. I believe it was like a Thursday.
Q. Sorry. In relation to March 19th, how far -- how much earlier was that?

A. Like a week.
Q. A week?
A. A week.
Q. And after he pulled you out of the car on that day, what happened?
A. On the day before this incident?
Q. Yes.
A. He tells me to step out. And he starts rambling through the car. And there was some school books in the back because Diana does go to school, too. He dumps all the books out, and then he asks me have I ever been arrested before. I told him, "Yes. I'm on probation right now. Yes, I do work." And on that prior day, I also had my uniform on. And on that prior day, he asked me for ID.
Q. Okay. Did you give him your ID?
A. Yes, I did.
Q. What else happened on that day?
A. On that day, he gave me back my ID. He asked me what am I doing around here. I pointed to the window. I said, "My girlfriend, Diana, lives right there. I'm waiting for her to come back out."
Q. Is there anything else you remember from the conversation with Officer O'Brien and Officer Zincone on that prior day?

A. On that prior day, that was it. He gave me back my ID. I got back in the vehicle and waited for her. She comes back out, and her son gets in the back seat. She starts screaming at me, saying why did I dump her stuff out on the floor in the vehicle. I told her it wasn't me, it was the officers.
Q. All right. I'm sorry. Was there any more conversation between you and the officers on that day?
A. No, there wasn't.
Q. On March 19th, you said Officer Zincone opened up the door and told you to get out, put the cigarette out?
A. Yes, he did.
Q. What happened after that?
A. Prior to him telling me to put my cigarette out, him and Officer O'Brien, if you have a picture of the vehicle I can show you where he was standing. Prior to that, he grabs my pants like this. If he's in front of me, he's like this and he grabs my pants and starts shaking my pants. He says, "I don't care if you have drugs; I'm looking for guns."
Q. Which officer told you this?
A. Zincone.
Q. All right. I'm going to show you Defendant's I again, which is the Expedition. Where were the

officers on the side of the car?

A. Officer O'Brien was right here, and Zincone was right here when the door was open.

Q. And the door was open. So the door -- I'm sorry. When you stepped out, where were you in relation to Officer Zincone and Officer O'Brien?

A. I was standing in the door jamb, and as he did that with his hands and shook my pants and asked me, "I'm not looking for drugs; I'm looking for guns," and his partner, Officer O'Brien, grabs my shirt, pulls me out the way. And then Officer Zincone starts to ramble through the car.

Q. Okay. Let's take it a step back. When Officer Zincone had ahold of your pants, he was right in front of you, correct?

A. Yes, he was.

Q. And then Officer O'Brien was just to your left; is that correct?

A. Yes.

Q. Now, you said Officer Zincone went into the car. What happened next?

A. He started searching through the car. I'm standing in front of him. The vehicle is here. After he pulled me out the way, after that, he comes back out the vehicle, grabs me by my neck, slams me to the

floor, and Officer Sion, who is near a trash can where the other people that were loitering or walking by, he was standing with his back turned towards those two officers. Upon that, he said I tried to run when I was on the ground. Once I was on the ground, he said I tried to run. Then he tells his other partner, Zincone tells Officer O'Brien there's a gun in the car. I said that gun is not mine.

So from that point on, they put me in the back of their cruiser, and my girlfriend begins to come around with a gas can. They move the vehicle from behind the Ford Expedition, they move it into another parking spot. They began to ask her whose vehicle it was.

MR. FITZGERALD: One moment, please.

Q. You said that Officer Zincone said he found a gun in the car?
A. That's what he said.
Q. And you told him what?
A. "That gun isn't mine."
Q. Did he show you the gun?
A. I did not see the gun at all.
Q. You didn't see the gun while you were in the car?
A. No, I did not.
Q. And he didn't pull it out and show you?

A. No, he did not.
Q. Now, if you look on the screen there, Defendant's L --
MR. FITZGERALD: Publish that to the jury, please.
Q. -- what is that a picture of?
A. That's the inside of the Ford Expedition.
Q. And along the console area there on the side of the console --
A. Yes.
Q. -- what's along the side there?
A. There is a button right here that controls the little CD thing, CD player. And also there's some wires that connect into the tape deck so it's like a portable CD player.
Q. Is there any other items or buttons or anything else along there that we can't necessarily see in this photo?
A. No, there isn't.
Q. Does Diana have a gun permit?
A. Yes, she does.
Q. You've seen that?
A. I was there when she took the test.
Q. Do you know if this gun is Diana's?
A. I have no clue.

Q. Who was the last person using this truck, as far as you know, before you got into it that afternoon?
A. To my recollection, it was Diana.
MR. FITZGERALD: No further questions.

**CROSS-EXAMINATION BY MR. VILKER**

Q. Good afternoon, Mr. Taylor.
A. Good afternoon, sir.
Q. Mr. Taylor, you have a prior felony conviction on your record; is that correct?
A. Yes, I do.
Q. In fact, you were convicted in April of 2002; is that right?
A. Yes.
Q. And you were convicted of three separate felony offenses, isn't that true?
A. That is also true.
Q. The first was for conspiracy to distribute heroin; is that correct?
A. Yes, it was.
Q. The second was for possession of heroin with the intent to distribute?
A. Yes, it was.
Q. And the third was for assaulting a federal officer?
A. Yes, it was.

THE COURT: Let me just interrupt for a moment. I need to explain something to you, ladies and gentlemen, about this evidence. Individuals are tried based on the evidence as to whether they did or did not commit the offense with which they're charged and not on the basis of what they might have done in the past.

Now, this evidence was properly before you for the purpose -- for two purposes, really. One, as I'll explain to you later, in order to prove Mr. Taylor guilty of possessing a firearm after having been convicted of a felony, the Government has to present evidence that he has previously been convicted as a felon.

The second purpose for which you may consider this evidence is to the extent that you think the fact that Mr. Taylor was previously convicted of these other offenses influences his credibility or the weight that you give to his testimony. You may consider it for that purpose, but you can't consider the fact that he was convicted previously of some other crime as evidence that, therefore, he's more likely to have committed this crime.

There are only two purposes to consider it for, one, that the Government has proven that he was previously convicted of a felony, which they have to

prove in order to convict him of this offense; and two, to the extent that you think the prior conviction may affect the degree of weight that we gave his testimony, you can consider it for that purpose but not for any other purpose.

**BY MR. VILKER**: (Continuing)

Q. Mr. Taylor, this particular Expedition was bought by Ms. Bonet?

A. Yes, it was.

Q. She purchased it at the end of the prior year, 2004?

A. No. It was like around December.

Q. Of 2004?

A. Yes. I'm sorry. 2004.

Q. Were you there with her when she purchased it?

A. No, I wasn't.

Q. I believe you testified, I'm a little confused in your answers, that you did use this particular truck on prior occasions?

A. Yes. Every now and then when she allowed me to use it.

Q. Did you have other cars that you were using as well?

A. No, I didn't have no vehicle at all.

Q. So you were using her car from time to time?

A. Yes.
Q. And in particular, you said a few days before when you had your first interactions with these police officers you were sitting in that very car?
A. Yes.
Q. Now, the apartment at 60 Fairfield was in her name?
A. Yes, it was.
Q. But you were living there from time to time?
A. I would come there, stay there from time to time, yes.
Q. You were -- is it safe to say you were involved in a romantic relationship with her?
A. Yes.
Q. You were a couple?
A. Yes.
Q. Are you still a couple?
A. Yes.
Q. Now, as a matter of fact, you used this car so much that you kept your driver's license up on the molding near the driver's side seat?
A. That's not correct.
Q. Okay. Did you hear Officer Zincone's testimony that on the date of March 19th, 2005, you took your license from the molding on top of the driver's side

seat and gave it to him?
A. I did not give him a license from on top of the molding.
Q. My question was were you in court when Officer Zincone testified to that?
A. Yes. I heard him clearly that he did testify to that.
Q. You're saying that he was incorrect about that?
A. He was very incorrect about that.
Q. So you didn't keep your license inside the car?
A. No, I did not.
Q. Now, I believe you said you have to this day, you have no idea whose gun it was in that car?
A. That is correct.
Q. And that something about you know that Diana had a permit, but you don't know if this was her gun?
A. I know of her permit. I was there. Do I know who gun it is? I do not know who gun it is.
Q. Did you ever ask your girlfriend if that was her gun?
MR. FITZGERALD: Objection.
THE COURT: Overruled. You may answer that.
A. Have I asked her --
THE COURT: Just answer that question or no. Either you did ask her or you didn't ask her.

A. Yes, I did ask her.
Q. You don't know if it was her gun or somebody else's?
A. Yes. I do not know.
Q. So someone else, conceivably, could have borrowed the car and just left their gun behind in this car, borrowed the Ford Expedition and left their gun in the car?
MR. FITZGERALD: Objection. Speculation, your Honor.
THE COURT: Read that question back, please.
(Pending question read by the reporter.)
THE COURT: Sustained.
Q. You don't know if the gun belongs to Ms. Bonet or somebody else?
A. I do not know that.
Q. And your best memory is the last person to drive the car prior to you getting in on March 19th was Ms. Bonet?
A. Yes.
Q. Now, you're not debating or you're not disagreeing with the fact that the police officers ultimately found a handgun tucked next to the driver's seat?
A. I did not see the gun.
Q. You don't know if the gun was, in fact, there or

not?
A. I did not see the gun.
Q. You don't know if the officers indeed found a gun or whether they were making that up also?
MR. FITZGERALD: Objection.
THE COURT: Grounds?
MR. FITZGERALD: He did not -- that wasn't his testimony.
THE COURT: He didn't ask him about his testimony. Read the question back so Mr. Fitzgerald can hear it.
(Pending question read by the reporter.)
MR. FITZGERALD: He hasn't alleged anybody made up anything.
THE COURT: The "also" is the part you're objecting to?
MR. FITZGERALD: Yes.
THE COURT: Sustained as to the form of the question.
Q. Do you know if the officers found that gun or whether their testimony that they found a gun was false?
A. Obviously, they have a gun, so, yeah.
Q. Now, you were woken up sometime around 2:30, I think you said, that day?

A. Yes.
Q. And you go down to the car with your girlfriend?
A. Yes.
Q. And you sit in the driver's side seat?
A. Yes.
Q. And she sits in the passenger seat?
A. Yes.
Q. And you immediately try to start the car?
A. Yes.
Q. And how long does the period take from when you first get in the car until you realize that there's no gas in the car?
A. We tried it twice, and the first time it started up and shut off. Then I tried to start the vehicle again. Then I told her to go get a gas can, because I really don't know anyone around there. And she takes her keys, and she gets out the vehicle. I believe she went to go get a gas can. And next thing you know, Officer Zincone comes up to the vehicle.
Q. Okay. I'm just trying to get a sense of the time frame we're dealing with here. From the moment you first got into the car with Ms. Bonet until Officer Zincone comes up to the door and you see him for the first time, how much time would you say had passed?
A. I would be lying if I told you approximate time.

I couldn't even give you approximate time.
Q. How long had Diana been gone for looking for gas, did she just walk out of the car or had she been gone a while?
A. She went to get a gas can. We both were going to walk to go to the gas station around the corner to go get gas.
Q. My question is --
A. How long?
Q. Had she just left?
A. She just left out the vehicle. So maybe a minute. Maybe a minute. Not even that long.
Q. So the period of time from when you get into the car with Ms. Bonet until Officer Zincone is at your window is about a minute?
A. About that.
Q. Okay. Now, when you sit down in the car, you don't notice anything, I take it, stuffed between the driver's side seat and the center console?
A. There was nothing stuffed between the center console and the seat. If there was, believe me, I would not have gotten into that vehicle.
Q. So you're saying now there wasn't a gun in the car?
A. I did not see any gun in the vehicle.

Q. You didn't notice -- did you notice the towel in the car?
A. That towel that you have is to clean the vehicle. That towel was in the back seat.
Q. The towel was in the back seat. Where in the back seat?
A. Behind the driver's side.
Q. Okay. So there was no towel within reach of your right hand?
A. No, there was not.
Q. And there was certainly no gun that was tucked into the car?
A. No, there was not.
Q. Because if you had seen -- if there were, in fact, a gun between the driver's side seat and the center console, you surely would have been able to see that?
A. Yes, I would.
Q. Now, you get into the car with Ms. Bonet, and you realize there's no gas?
A. Yes.
Q. So you send -- you stay in the car and you send her off to get a gas can?
A. Yes.
Q. And you put on some music?
A. Yes.

Q. And now, from the time you put on the music, how much time would you estimate passed before Officer Zincone got to the side of your car?
A. About a minute, as I said before. As soon as she got out, I mean, the CD player was already on. I mean, just the fact of me turning it up, you know. I sat there, smoked a cigarette. And next thing you know, he comes to the vehicle.
Q. Okay. And then he, if I understood your testimony, just told you to get out of the car?
A. He told me to step out the vehicle.
Q. You weren't -- you didn't happen to get into any conversation with him?
A. No.
Q. Did you say -- did you hear him testify that you said something along the lines of "You just checked me"?
A. I said to him after he was grabbing me and searching me, I said, "You guys just checked me last week."
Q. Before that, before he grabs you and pulls you out of the car, did you have any interactions with him, did you say anything to him?
A. No, I did not.
Q. He just came, took you out of the car and grabbed

you?

A. He actually opens the door, telling me to step out, grabs my pants like this. He said, "I don't care if you have drugs; I'm looking for guns."

Q. My question is very simple, Mr. Taylor. Before Officer Zincone grabbed you and told you to get out of the car, did you have any words with him, before that point?

A. No, we did not.

Q. And you never gave him your license?

A. I didn't give him my license.

Q. Because your license you didn't store on top of the molding of the car?

A. No, I did not. In fact, Diana had my license in her wallet and still to this day she holds my license in her wallet.

Q. So that testimony of Officer Zincone was also incorrect?

A. Yes. And believe me, I don't mean to cut you off, I have no problem with the law. I might have done things that were in the past, but there was three years that I spent on my time getting my life together and my family together, and I just want you to know that.

MR. VILKER: Your Honor, I move to strike this answer as unresponsive.

THE COURT: Jury will disregard the last answer. It really wasn't responsive to the question.
Q. When Officer Zincone approached your car, were you touching anything with your right hand?
A. No, I was not. I had a cigarette in my hand.
Q. Did you hear Officer Zincone's testimony that you are apparently stuffing something with your right hand?
A. I heard his testimony.
Q. That testimony was incorrect?
A. Yes, it was.
Q. Did you hear Officer O'Brien's testimony --
A. I heard his testimony.
Q. If I could please finish the question.
A. All right. I'm sorry.
Q. The way it works, I ask the question and you give the answer.

Did you hear Officer O'Brien's testimony that he also saw you apparently stuffing something with your right hand?
A. Yes, I did.
Q. And that was also incorrect?
A. Yes.
Q. Because you weren't stuffing anything with your right hand?
A. No, I was not.

Q. Officer Zincone just came and grabbed you and told you to get out of the car?
A. He actually came up to the vehicle, opened the car door and told me to step out. Whatever his purpose or whatever it was, why he came to that vehicle, I have no clue. I'm still clueless to this day, why did he come over to my vehicle.
Q. And you do, at some point, get out of the car?
A. Yes.
Q. And you're standing in between Officer Zincone and Officer O'Brien?
A. Yes, I am.
Q. And you're saying now that you didn't try to run?
A. I did not.
Q. Did you hear Officer Zincone say that you did try to run, you were able to take a few steps before you were tackled?
A. When --
Q. That's a simple question. Did you hear that testimony?
A. Yes, I heard that testimony.
Q. That testimony would be wrong also?
A. That I tried to run?
Q. Right.
A. Yes.

Q. Okay. Did you hear Officer O'Brien offer similar testimony?
A. Yes.
Q. And that would be wrong, also?
A. Yes.
Q. And did you hear Officer Sion testify that from the other side of the lot he could see you scanning the area and then he saw you try to run?
A. I heard what Officer Sion said, but his back was turned towards those two officers, Zincone and O'Brien.
Q. So Officer Sion -- did you hear Officer Sion testify that his back wasn't turned at that point and he could see you running?
A. I didn't run. If I was in between the door jamb, there was no way for me to run.
Q. I realize it wasn't a long run. And are you testifying now that you didn't try to run?
A. I didn't try to run at all.
Q. Are you testifying that when Officer Sion, when he testified that he saw you trying to run, that Officer Sion's testimony was wrong as well?
A. Yes, it is.
Q. You're testifying as far as -- you do admit that you did say at some point that "The gun ain't mine"?
A. Yes, I did.

Q. Okay. But you're saying that came after Officer Zincone stated -- let me withdraw that. When you said "The gun ain't mine," are you testifying that came after Officer Zincone already said that there was a gun in the car?
A. Can you repeat that again, please.
Q. When you made the statement that the gun wasn't yours --
A. Right.
Q. -- are you testifying that you only said that after Officer Zincone already stated that there was a gun?
A. I stated that after he threw me to the ground and said, "He tried to run," and then after that, he also said, you know, there was a gun in the car because I heard him talking to Diana. I said to him "That is not my gun." I did not see the gun.
Q. Okay. So Diana comes back with the gas can?
A. Yes.
Q. How much time passes from the time that you're taken to the ground by the officers and you're arrested until Diana comes back?
A. Give you an estimate, about five to ten minutes.
Q. Okay. So five to ten minutes later, you hear this conversation between one of the officers and Diana

about the gun, and that's at the point where you state that the gun is not yours?

A. Yes.

Q. And not immediately when you're taken to the ground?

A. Yes. I said it to him on a number of occasions.

Q. My question is very simple. When you were taken to the ground, did you at that very moment state that the gun wasn't yours?

A. Yeah.

Q. Did Officer Zincone --

A. After he had said there was a gun in the car, I said, "That is not my gun."

Q. You only said that after Officer Zincone had voiced the fact that there was a gun in the car?

A. I said it twice. When he said there was a gun in the car, I said, "That's not my gun."

Q. Okay. I hear you.

MR. VILKER: Could I just have one moment, your Honor?

THE COURT: Yes.

MR. VILKER: I have nothing further.

MR. FITZGERALD: No redirect.

THE COURT: All right. You may step down, Mr. Taylor.

THE WITNESS: Thank you.

# C E R T I F I C A T I O N

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

Anne M. Clayton

Anne M. Clayton, RPR

June 5, 2006

Date