IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * | CRIMINAL ACTION |
| USA * | 06-13T |
| VS. * | JUNE 19, 2006 |
| ROBERT TAYLOR * | PROVIDENCE, RI |
| * * * * * * * * * * * * | |

HEARD BEFORE THE HONORABLE ERNEST C. TORRES

CHIEF DISTRICT JUDGE

(CROSS-EXAMATION ROBERT TAYLOR TESTIMONY)

APPEARANCES:

FOR THE GOVERNMENT: LEE H. VILKER, ESQ.
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT: KEVIN FITZGERALD, ESQ.
Federal Defender's Office
10 Weybosset St.
Providence, RI 02903

Court Reporter: Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI 02903

Proceeding reported and produced by computer-aided stenography

CROSS-EXAMINATION BY MR. VILKER

Q. Good afternoon, Mr. Taylor.
A. Good afternoon, sir.
Q. Let me get this straight. Your story is that you weren't touching a gun in the car that day?
A. No, I did not, sir.
Q. And your story is you weren't trying to stuff a gun next to the driver's side seat?
A. No, I was not sir.
Q. Is it your story --
MR. FITZGERALD: Objection, your Honor, just to the form of the question, please.
THE COURT: The word "story," you mean?
MR. FITZGERALD: That's correct.
THE COURT: Overruled.
Q. Your story is that indeed there was not even a gun next to the driver's seat of the car; is that right?
A. I did not see a gun, sir.
Q. If there was a gun next to where you were seated, you surely would have been able to see it?
A. I would have noticed it.
Q. So there was no gun next to the driver's side seat that you were sitting next to?
A. No. There was not.
Q. And you have no idea how that gun entered the car?

A. I have no clue, sir.
Q. You have no clue who the gun belonged to?
A. No, I do not.
Q. And your story, again, is that you never tried to run?
A. I did not, sir.
Q. And your story is that even though you never tried to run, Officer Zincone just grabbed you from behind your neck for no reason and threw you to the ground?
A. He grabbed me in the front, facing him. He grabbed my neck like this, turned me around, took his leg and swooped me to the floor.
Q. You didn't try to run?
A. I did not, sir.
Q. He grabbed you by your neck?
A. By my neck.
Q. Even though you were being perfectly in compliance?
A. I was in compliance with him, sir.
Q. And brought you straight back to the ground?
A. Yes.
Q. And is it your testimony that the Providence police officers just got it all wrong in every single important detail in this case?
MR. FITZGERALD: Objection, your Honor.

THE COURT: Sustained.

Q. Is it your testimony that the police officers got it wrong when they testified that you were stuffing the gun next to the driver's side seat?

MR. FITZGERALD: Objection.

THE COURT: Is it to whether he's accurately quoting what they said?

MR. FITZGERALD: To the characterization in the testimony, yes.

THE COURT: I'll sustain the objection. I don't think those were the exact words that were used, maybe I'm wrong, but we'll let the jury decide that. Rephrase the question.

MR. VILKER: Thank you, your Honor.

Q. Is it your testimony, Mr. Taylor, that the police officers, namely, Officer Zincone and Officer O'Brien, were wrong when they said they saw you moving your hand and covering something up with the towel?

A. Yes, sir.

Q. For some reason they just got it wrong?

A. Yes.

MR. FITZGERALD: Objection.

THE COURT: The question was answered.

Q. Now, you mentioned before that you had an altercation that you did some time for?

A. Yes.
Q. That altercation involved three felony convictions, did it not?
A. Yes.
Q. That was back in Federal Court on April of 2002?
A. Yes.
Q. One of the counts was for conspiracy to distribute heroin, isn't that true?
A. Yes.
Q. Another of the counts was for possession of heroin with the intent to distribute?
A. Yes.
Q. And the third is for assault on a federal officer, isn't that right?
A. Yes.
THE COURT: Had you finished answering that question?
THE WITNESS: Yes.
THE COURT: Again, ladies and gentlemen, I need to explain something to you about the effect of past convictions. Remember I told you earlier that you could consider the fact that Mr. Taylor may have been convicted of a felony in the past as evidence as to whether he possessed a firearm after having been convicted of a felony but not as evidence as to whether

he committed this offense.

And now you may consider evidence that he had been convicted of one or more felonies in the past as evidence in determining his credibility, how much weight you should give to his testimony. It's up to you to decide how much weight, if any, the fact that he was previously convicted of these crimes should affect your assessment of his credibility. That's entirely up to you to decide, but you may properly consider the prior convictions for that purpose, but you still cannot properly consider the prior convictions as evidence that because he may have committed crimes in the past, therefore, he must have committed this crime.

You should look at the evidence that's been presented in making that determination, but you can consider his past convictions in deciding the extent to which you give his testimony weight, you believe it or disbelieve it or whatever you see fit.

Q. Now, Mr. Taylor, there's no question you were sitting in the Ford Expedition on March 19th?

A. Yes.

Q. When the police officers got there, you were alone in the car?

A. Yes, I was.

Q. And the car belonged to your girlfriend?

A. Yes.
Q. Diana Bonet you pronounce it?
A. Yes.
Q. She bought the car a few months earlier or at the end of 2004?
A. Yes.
Q. Now, that day, March 19th, wasn't the first time you had ever been in that Expedition?
A. No, it wasn't.
Q. As a matter of fact, you used that Expedition every now and then when Diana would let you?
A. Yes.
Q. Sometimes she would let you borrow the car when you asked her?
A. Sometimes.
Q. Sometimes you would use the car with her?
A. Yes.
Q. And sometimes she would just let you borrow it on your own?
A. Sometimes, yes.
Q. And you didn't have any other vehicles that you were using?
A. No, I did not.
Q. You didn't have your own set of keys to the car, did you?

A. No, I did not.
Q. You had to borrow a set of keys from Diana whenever you wanted to use the car?
A. Yes.
Q. Now, the car had a CD player in it?
A. Yes.
Q. It was the kind of CD player, it was portable CD?
A. Portable CD player with a changer to the side.
Q. There were some wires that connected the CD player to the tape deck?
A. Yes.
Q. And like any other car, to listen to the CD player, you'd have to turn the key in the ignition and then turn the CD player on?
A. Yes.
Q. Now, you talked about this incident a week before when Officer Zincone -- well, you claim Officer Zincone and Officer O'Brien searched you in that Expedition earlier?
A. Yes.
Q. And again, that they did the exact same thing, for no reason whatsoever they opened up the door and forced you to get out?
A. They told me to step out. They opened the car and told me to step out, yes.

Q. There were no other police officers that are ever in that area?
A. I don't know any other officers around that area.
Q. And you're absolutely certain it was these two officers?
A. Yes.
Q. Now, on this prior occasion, Officer Zincone asked you for your driver's license?
A. On this prior occasion?
Q. The prior occasion.
A. He asked me for an ID.
Q. Did you hand him your driver's license?
A. I didn't hand him my driver's license.
Q. What did you hand him?
A. I handed him a work ID.
Q. You didn't have your driver's license with you?
A. No, I did not.
Q. Now, back in March of 2005, you were involved in a relationship with Ms. Bonet?
A. Yes.
Q. And you were a couple?
A. Yes.
Q. And you actually share a child together?
A. Yes, we do.
Q. And you're still a couple now?

A. Yes.
Q. You would stay with her at 60 Fairfield Street from time to time?
A. From time to time, yes.
Q. And you know where she lives now?
A. Not at this current moment.
Q. You don't know where she lives now?
A. Not at this current moment. To my knowledge, she was living with her mother.
Q. Okay. You have a child together?
A. Yes.
Q. You're saying you don't know where she and your child are?
A. She brings my child by. Most of the time I'm working, and I'll call her. She'll come by. I know that she said that she was going to get a place. I haven't been over to her house at all.
Q. When was the last time you had seen her?
A. Yesterday.
Q. You haven't seen her today?
A. Yes, I've seen her today, too.
Q. You had lunch with her today?
A. Yes.
Q. And she knows you're on trial here for possession of a gun?

A. Yes.
Q. That was found in her Expedition?
A. Yes.
Q. Now, your testimony is that you never saw the gun in that car on March 19th?
A. No, I did not.
Q. And have you ever seen a gun in that car before?
A. No, I did not, sir.
Q. Other than in court, you've never seen that gun?
A. No, I did not.
Q. You never saw Ms. Bonet with that gun?
A. No, I did not.
Q. You've never seen her with any gun, isn't that true?
A. That's true.
Q. As a matter of fact, you know she's never bought a gun?
A. That -- I know she hasn't bought a gun, yes.
Q. You know she doesn't have a gun?
A. Yes.
Q. You know she's not the one that put that gun in that car?
MR. FITZGERALD: Objection. Sorry. No objection.
THE COURT: You withdraw the objection?

MR. FITZGERALD: Yes.

THE COURT: You may answer.

A. I'm not sure, sir.

Q. You're not sure if she --

A. I'm not sure if she's the one who put it there or not, but I'm not saying she did. I don't know who put it there, sir.

Q. Didn't you just testify a minute ago that you know she's never bought a gun or owned a gun?

A. I know she has not bought a gun. So my answer is do I know who put the gun there, I do not.

Q. Let me just back up. You know she's never bought a gun?

A. Yes.

Q. You've never seen her with a gun?

A. No.

Q. But you have no idea whether that gun was put in the car by Ms. Bonet?

A. No. It wasn't put in there by her.

Q. So now you know it wasn't put in there by her?

A. Yes.

Q. Because you talked to her about it?

A. Yes.

Q. And after speaking to her about it, today you know that she didn't put the gun in the car?

A. Yes.
Q. Did you testify a couple of weeks ago in a prior proceeding?
A. Yes.
Q. Didn't you testify a couple of weeks ago that you had no clue whether that gun was put in the car by Ms. Bonet?
A. I still have no clue who put it there. I don't know who put it there, sir.
Q. Didn't you just testify that now you know --
A. I understand what you're saying, but I do not know who put the gun there.
Q. So now you're saying Ms. Bonet could have put the gun there?
A. I'm not saying she did or she didn't. I don't know.
Q. Have you spoken with her about it?
A. I mean we spoke, but vaguely. We don't really talk about. Our life doesn't consist on talking about this case. Basically, we have other problems besides talking about this case, sir.
Q. You're on trial now in Federal Court for being a convicted felon in possession of a firearm, right?
A. Yes.
Q. The gun is found in the car that your girlfriend

owns?
A. Yes.
Q. And you don't have -- you have too many pressing things to talk about that you can't talk to her about where this gun came from?
A. We haven't even really talked about that case, sir.
Q. Okay. Now, as far as you know, Ms. Bonet was the last one to use that Expedition before you went down with her at 2:45 or three o'clock in the afternoon?
A. Yes.
Q. She went out the night before dancing?
A. Yes.
Q. And she came back, and the car was empty?
A. The car wasn't there when I got home.
Q. Okay. When she came back, she parked the car in the parking lot, for all you know?
A. Yes.
Q. When you came down the next day, you tried to turn it on and there was no gas?
A. Yes.
Q. So the car remained in the parking lot after she brought it there?
A. Yes.
Q. Now, you and Diana get into the car?

A. Yes.
Q. You're sitting in the driver's side seat?
A. Yes.
Q. You turn it on once and it starts?
A. Yes.
Q. She says she has to get her cell phone?
A. Yes.
Q. She goes up and gets her cell phone?
A. She goes and gets her cell phone.
Q. She comes back to the car?
A. Yes.
Q. You then try to turn it on again, and it won't start, and the gas light comes on?
A. Yes.
Q. So you tell Diana to go get a gas can?
A. Yes.
Q. Because you don't know the area that well?
A. Yes.
Q. Now, Diana takes the keys out of the car, doesn't she?
A. Yes.
Q. And you don't have keys to the car?
A. I don't have a pair of keys to the car. She has her house keys and the truck keys on there.
Q. So she took the keys and left?

A. Yes.
Q. Then Officer -- so you're sitting there in the car, Diana's gone to get a gas can, and you're listening to music?
A. Yes.
Q. Smoking a cigarette?
A. Yes.
Q. You're smoking with your right hand, by the way?
A. My left hand.
Q. Your left hand?
Now, you're sitting in the car smoking, listening to music, and all of a sudden Officer Zincone comes in and opens the door?
A. Yes.
Q. So the first time you see the police officers that day is when Officer Zincone opens up the door?
A. Yes.
Q. Now, how long were you in the car from the moment Diana left to get gas until Officer Zincone came by?
A. All together, it was probably a second, two seconds. It wasn't that long before they pulled up.
Q. So within a matter of seconds, Diana's gone and the police officers are at the car?
A. Yes.
Q. Now, not only does Officer Zincone opened your

door for no reason, but he orders you out of the car?
A. Yes.
Q. And then pulls on your pants for no reason?
A. He tells me to put out the cigarette and he steps in front of me and he grabs my pants and he tells me, "I'm not looking for drugs. I'm look for guns." That's what he says to me, sir.
Q. And then he goes into the car?
A. And then goes into car.
Q. Comes out, grabs your neck and throws you to the ground?
A. Yes.
Q. And you're not trying to run?
A. No.
Q. You're just standing there?
A. Yes.
Q. Now, before --
MR. VILKER: Could I have one moment.
Q. During the last proceeding you were asked a question about whether you were touching anything with your right hand. Do you recall that?
A. Yes.
Q. Didn't you testify -- well, I'll ask the question then. The question was this: "When Officer Zincone approached your car, were you touching anything with

your right hand?" The answer: "No, I did not. I had a cigarette in my hand." Is it your testimony that the cigarette was in your right hand or in your left hand?
A. It was in my left hand, sir.
Q. So your right hand, you weren't touching anything with your right hand?
A. The only thing that I was touching was the CD controller. That was it.
Q. So you were reaching down to the front of the car touching the CD?
A. The CD controller is on the seat, and I'm turning it to change the tracks on the CD.
MR. VILKER: Do you have the picture of the inside of the car.
Your Honor, I request is that Exhibit L be published to the jury and to the defendant.
Q. Now, are you able to see that, Mr. Taylor?
A. Yes, I can.
Q. You're sitting here in the car?
A. Yes.
Q. The CD, is this the CD player?
A. That's the CD player, and the CD controller is right around here.
Q. So your testimony is that you were touching this area, not back where Officer Zincone testified you were

touching?
A. Yes.
Q. You were just changing CD's?
A. I was changing the CD channel for another track, because when you're driving, you can't just play the CD player and just keep pressing buttons. When I bought the CD changer thing, you can just turn it and have a little Velcro strip where you can put it anywhere in the car and you can just turn it.
Q. What CD were you listening to when Officer Zincone got to car?
A. I was listening to John Legend.
Q. And you wanted to change it from John Lennon when Officer Zincone --
A. I was changing the whole CD. What I did was it was a song that I didn't want to hear so I changed it to another song of John Legend.
Q. Okay. So you were skipping forward to another song?
A. Yes.
Q. You were doing this while Officer Zincone comes to your door?
A. Yes.
Q. So you're touching this area, not that area?
A. No, I did not.

Q. Now, you're saying there was no gun in the car?
A. I didn't see no gun in the car, sir.
Q. And there certainly was no gun stuffed right next to where you were sitting between the driver's side seat and the center console?
A. No, there was not.
Q. Because you would have noticed that?
A. I would have noticed.
Q. Did you hear Officer Zincone's testimony that he went into the car, lifted the towel and found a gun stuffed right between the driver's side seat and the center console?
A. That towel that you have, we use that to clean the vehicle. That towel was behind the driver's seat.
Q. Okay. My question was did you hear his testimony --
A. I heard his testimony.
Q. -- that he found a gun right in that spot?
A. Yes. I heard his testimony, sir.
Q. He was wrong?
A. He was wrong.
Q. Did you hear Officer O'Brien's testimony that when he went in to seize the gun, he also found the gun stuffed right in there?
A. I heard both of their testimonies, sir.

Q. They both are just wrong?
A. They both are wrong, sir.
Q. Now, you took down your driver's license from the molding and gave it to Officer Zincone that day?
A. I never gave him no driver's license. Diana has my driver's license. Now my grandfather has it. She did before; now she doesn't.
Q. How long did she hold onto your driver's license?
A. It was prior to being when we first got the vehicle, and we went out to a club. And she had a purse, and I don't like keeping things on me, so I handed her my ID and I said "Hold onto it." And from that point on, she's had my ID or my license.
Q. When did she first start keeping your driver's license?
A. The day that we went to the club. It was -- I know it was kind of like a holiday or so.
Q. Of 2004 or --
A. Of 2004.
Q. So on the date that this happened, on March 19th of '05, she's holding your driver's license for you?
A. Yeah. She had it in her wallet.
Q. Does she have it in her wallet today?
A. No. She gave it back to me when I recently came home, and I gave it to my grandfather to hold.

Q. When was that?
A. Sometime around March.
Q. Okay. And you testified in a prior proceeding on May 30th, a few weeks ago?
A. Um-hum. (Affirmative.)
Q. And were you asked this question; did you give this answer:
Question: You never gave him your license?
Answer: I didn't give him my license.
Question: Because you didn't store your license on top of the molding of the car?
Answer: No, I did not. In fact, Diana had my license in her wallet and still to this day she holds my license in her wallet."
A. Well, she did, but I did not store my license on top of a molding. I did not give Officers Zincone or O'Brien or Sion no license.
Q. My question was on May 30th, you testified under oath?
A. Yes. She had my license at that time, but now, she doesn't. Around that time, she did have it, sir.
Q. On May 30th, you stood right where you're standing now?
A. Yes.
Q. You raised your right hand, and you swore to tell

the truth?
A. Yes.
Q. You testified on May 30th that on that day, Diana Bonet had your license or her?
A. Well, she did.
Q. Didn't you just testify just now a few minutes ago that you took it back from her in March?
A. Yes, I did.
Q. For how long have you not known where she lives?
A. From a long time. As far as I know, she was living with her mother, and my mother can tell you that, too.
Q. So she was holding onto your driver's license even though you didn't know where she lived?
A. She was living with her mother at that time.
Q. You didn't know exactly where that was?
A. Where her mother lives.
Q. Where Diana was living.
A. With her mother. Yes, I knew where her mother lived at. Where she lives at now, I don't know.
Q. How long have you not known where she lived?
A. Basically, we been have a little bit of problems, so if we talk, we talk here and there. We haven't been talking that much. I mean, I don't want to put my business out there, but we do talk here and there.

Q. Okay. My question is a simple one. You said right now you don't know where she lives?
A. Right now, to my knowledge, I thought she lives at her mother's house.
Q. Okay. I thought you said you weren't sure where she lived?
A. That's where I thought she lived at.
Q. So now you know where she's living?
A. At her mother's.
Q. Now, did you hear all three police officers testify that you tried to run away?
A. Yes, I did.
Q. And you're saying that's just all completely erroneous?
A. I'm saying they're wrong about that, yes.
Q. You were just standing there being perfectly compliant?
A. I was in compliance with them, sir.
Q. Now, at some point, you're not disputing you make a comment that the gun's not yours?
A. After Officer Zincone said there was a gun in the car, I said, "That's not my gun."
Q. So you're claiming Officer Zincone said it first, and you said it afterwards?
A. Yes, he did, sir.

Q. Now, your testimony is that at some point you're brought back to the -- well, let me just ask it this way.
A. Brought to the back of the police car.
Q. You're brought to the back of the police car?
A. Yes.
MR. FITZGERALD: Objection. That's beyond the scope of direct. That wasn't his testimony.
THE COURT: Overruled.
Q. Were you at some point brought to the back of the police car?
A. Yes.
Q. And after you were brought back to the police car, Diana comes back to the scene?
A. Yes.
MR. FITZGERALD: That is beyond the scope of direct. I object.
THE COURT: Overruled.
Q. Officer Sion is sitting next to you?
A. Yes, he was.
Q. In the back seat of the car?
A. Yes, he was.
Q. And you heard Diana speaking with Officer Zincone?
A. Yes.
MR. FITZGERALD: Your Honor, I'm going to

object. All of this was not asked about on direct.

THE COURT: Overruled. You may answer.

Q. You heard Officer Zincone saying something to Diana about finding a gun?

A. Yes.

Q. And at that point, you say the gun's not yours?

A. Not at that point, but at the point where they had moved the car from in back of the Expedition to the other side. The vehicle was parked this way. So they moved it from in back of the Expedition and pulled it onto the side. Diana comes around with the gas can, and she asks them what's going on. He said, "Well, we found a gun in the vehicle." That's when they get out, they run the plates on the car, find that the vehicle was registered to her. They get out, they walk towards the back area of Fairfield where he showed you on the picture, and they had went into the house. I don't know from that point on what they had talked about, but Officer Sion said to me in the back, where did I get the gun. I said, "I don't know nothing about no gun." From that point on he made a little small talk about one of Diana friends and making jokes about me being prosecuted by the judge.

Q. Mr. Taylor, when you were in the car, were you able to hear a conversation between Diana and Officer

Zincone and Officer O'Brien?

A. The only conversation I heard, sir, was that he asked her whose vehicle it was, the fact that who am I to her. And it was very small talk, and they moved the vehicle. And that was it.

Q. Did you hear him tell her something about the gun?

A. He said that there was something in the vehicle. What they talked about, I don't know.

Q. Are you saying that's not the time that you said that the gun wasn't yours?

A. No. I said it when Officer Sion was in the car with me, sir. I said it to him twice on two occasions.

Q. Again, May 30th, you testified in this courtroom?

A. Yes.

Q. And, again, you were put under oath?

A. Yes.

Q. You swore to tell the truth?

A. Always.

Q. Were you asked this question and did you give these answers.

"Question: When you made the statement that the gun wasn't yours, are you testifying that you only said that after Officer Zincone already stated that there was a gun?

Answer: I stated that after he threw me to the

ground, and he said, 'He tried to run.' And then after that, he also said, you know, 'There was a gun in the car' because I heard him talking to Diana. I said to him, 'That is not my gun. I did not see the gun.'"

The questions continue: "How much time passes from the time that you're taken to the ground by the officers and you're arrested until Diana comes back?

Answer: To give you an estimate, about five to ten minutes.

Question: Okay. So five to ten minutes later you hear this conversation between one of the officers and Diana about the gun and that's at the point where you state that the gun is not yours?

Answer: Yes."

Did I accurately read your testimony?

A. Yes.

MR. VILKER: I have nothing further.

C E R T I F I C A T I O N

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

Anne M. Clayton

Anne M. Clayton, RPR

June 19, 2016

Date